**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JASON STRONG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LUCIAN TESSMANN, WILLIAM VALKO, | ) |
| DONALD MEADIE, MICHAEL LUFF, | ) |
| WALTER HOLDERBAUM, DOMENIC | ) |
| CAPPELLUTI, JOHN KREMPOTIC, ED | ) |
| WAGNER, GREG DUFFEY, DON SMITH, | ) |
| TODD WILLIAMS, ALEXANDER | ) |
| FERNANDEZ, LEONARD BREZINSKI, | ) |
| RICHARD CHIARELLO, CITY OF | ) |
| WAUKEGAN, GARY DEL RE, Former | ) |
| Sheriff of Lake County in his official capacity, | ) |
| VILLAGE OF BUFFALO GROVE, VILLAGE | ) |
| OF LINCOLNSHIRE, VILLAGE OF | ) |
| LIBERTYVILLE, VILLAGE OF | ) **JURY TRIAL DEMANDED** |
| BARRINGTON HILLS, VILLAGE OF | ) |
| VERNON HILLS, CITY OF NORTH | ) |
| CHICAGO, PARK CITY, VILLAGE OF | ) |
| ROUND LAKE BEACH, COUNTY OF LAKE, | ) |
| LAKE COUNTY MAJOR CRIMES TASK | ) |
| FORCE, | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff JASON STRONG, by his undersigned attorneys, for his complaint against

Defendants LUCIAN TESSMANN, WILLIAM VALKO, DONALD MEADIE, MICHAEL

LUFF, WALTER HOLDERBAUM, DOMENIC CAPPELLUTI, JOHN KREMPOTIC, ED

WAGNER, GREG DUFFEY, DON SMITH, TODD WILLIAMS, ALEXANDER

FERNANDEZ, LEONARD BREZINSKI, RICHARD CHIARELLO, CITY OF

WAUKEGAN, GARY DEL RE, Former Sheriff of Lake County in his Official Capacity, VILLAGE OF BUFFALO GROVE, VILLAGE OF LINCOLNSHIRE, VILLAGE OF LIBERTYVILLE, VILLAGE OF BARRINGTON HILLS, VILLAGE OF VERNON HILLS, CITY OF NORTH CHICAGO, PARK CITY, VILLAGE OF ROUND LAKE BEACH, COUNTY OF LAKE and LAKE COUNTY MAJOR CRIMES TASK FORCE, alleges as follows:

## INTRODUCTION

1.     Plaintiff Jason Strong was wrongfully arrested, charged and convicted of the murder of an unknown woman, whose decomposing body was found in a Lake County forest preserve in December 1999.   Plaintiff spent over 15 years unjustly incarcerated for this crime until May 2015, when the Lake County State's Attorney finally dropped all charges against Plaintiff and he was released.

2.     Plaintiff's wrongful conviction was caused by the actions of the Officer Defendants, identified in this Complaint.   These officers, acting individually and in conspiracy, fabricated a false scenario of how the victim was murdered.   They fed that scenario to a purported "witness" to the murder, who, at the direction of the Officer Defendants, furnished a series of statements implicating Plaintiff and another man.   The Officer Defendants coerced confessions from Plaintiff and from a purported "accomplice."   The Officer Defendants added "corroboration" from other supposed witnesses to the crime whom they manipulated and coerced into providing false evidence.   The Officer Defendants then transmitted their phony case to the Lake County State's Attorney's Office, which prosecuted and convicted Plaintiff.   The Officer

2

Defendants concealed their fabrication, coercion and manipulation from the State's Attorney and from Plaintiff's criminal defense counsel.

3.     Throughout his decade and a half of wrongful imprisonment, Plaintiff insisted that he was innocent.  The case against him fell apart when the victim's identity was discovered; new evidence revealed that the Officer Defendants' false scenario of her murder was inconsistent with the physical evidence and could not have occurred; and the witnesses came forward and acknowledged that their statements had been fed to them and/or were the product of coercion.  In the face of this new evidence, the Lake County State's Attorney dropped all charges against Plaintiff and did not oppose Plaintiff's petition in the Circuit Court of Lake County for a Certificate of Innocence, which the Court granted.

4.     Plaintiff suffered immeasurable harm as a result of his lengthy, unjust incarceration.  He continues to suffer as he struggles to integrate into the free community and repair his shattered life.  He brings this suit seeking justice and compensation from those responsible for his unjust charging and conviction.

## JURISDICTION AND VENUE

5.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Officer Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the United States Constitution.

6.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

7. This Court also has diversity jurisdiction over the entire case under 28 U.S.C. § 1332 because Plaintiff is a citizen of Tennessee and, upon information and belief, no Defendant is a citizen of Tennessee. The amount in controversy exceeds $75,000, exclusive of interests and costs.

8. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District and one or more of the Defendants is subject to the court's personal jurisdiction with respect to this action.

## PARTIES

9. Plaintiff Jason Strong spent over 15 years incarcerated in the State of Illinois for a crime that he did not commit. Plaintiff is a citizen of Tennessee.

10. Defendants Lucian Tessmann, William Valko, Donald Meadie and Domenic Cappelluti are current or former officers of the Waukegan Police Department and the Lake County Major Crimes Task Force.

11. Defendant Michael Luff is a current or former officer of the Park City Police Department and the Lake County Major Crimes Task Force.

12. Defendant Walter Holderbaum is a current or former officer of the City of North Chicago Police Department and the Lake County Major Crimes Task Force.

13. Officer Defendants John Krempotic and Leonard Brezinski are current or former Deputy Sheriffs in the Lake County Sheriff's Department and former officers of the Lake County Major Crimes Task Force.

14. Defendant Ed Wagner is a current or former officer of the Village of Buffalo Grove Police Department and the Lake County Major Crimes Task Force.

4

15.     Defendant Greg Duffey is a current or former officer of the Village of Lincolnshire Police Department and the Lake County Major Crimes Task Force.

16.     Defendant Don Smith is a current or former officer of the Village of Libertyville Police Department and the Lake County Major Crimes Task Force.

17.     Defendant Todd Williams is a current or former officer of the Village of Vernon Hills Police Department and the Lake County Major Crimes Task Force.

18.     Defendant Alexander Fernandez is a current or former officer of the Village of Barrington Hills Police Department and the Lake County Major Crimes Task Force.

19.     Defendant Richard Chiarello is a current or former officer of the Village of Round Lake Beach Police Department and the Lake County Major Crimes Task Force. The Defendants listed in paragraph 10 through this paragraph are sometimes collectively referred to herein as the "Officer Defendants."

20.     Upon information and belief, all of the Officer Defendants are citizens of Illinois.

21.     Defendant City of Waukegan is an Illinois municipal corporation and the employer of Officer Defendants Tessmann, Valko, Meadie and Cappelluti.

22.     Defendant Gary Del Re was the Sheriff of Lake County, Illinois, during the events giving rise to Plaintiff's wrongful conviction.  He is sued in his official capacity. As Sheriff, Defendant Del Re oversaw the Lake County Sheriff's Office, which was the employer of Officer Defendants Krempotic, and Brezinski.

23.     Defendant County of Lake is a county of the State of Illinois, which oversees the Lake County Sheriff's Office. Lake County is obligated by Illinois statute to pay any judgment entered against Defendant Del Re in his official capacity.

24.     Defendant Village of Buffalo Grove is an Illinois municipal corporation that is or was the employer of Defendant Wagner.

25.     Defendant Village of Lincolnshire is an Illinois municipal corporation that is or was the employer of Defendant Duffey.

26.     Defendant Village of Libertyville is an Illinois municipal corporation that is or was the employer of Defendant Smith.

27.     Defendant Village of Barrington Hills is an Illinois municipal corporation that is or was the employer of Defendant Fernandez.

28.     Defendant Village of Vernon Hills is an Illinois municipal corporation that is or was the employer of Defendant Williams.

29.     Defendant City of North Chicago is an Illinois municipal corporation that is or was the employer of Defendant Holderbaum.

30.     Defendant Park City is an Illinois municipal corporation that is or was the employer of Defendant Luff.

31.     Defendant Village of Round Lake Beach is an Illinois municipal corporation that is or was the employer of Defendant Chiarello.

32.     Defendant Lake County Major Crimes Task Force is an inter-agency law-enforcement organization formed in or around February 1992 by, *inter alia*, the Lake County Sheriff's Office and Lake County, the City of Waukegan, the City of North

Chicago, Park City, the Village of Vernon Hills, the Village of Libertyville, the Village of Lincolnshire, the Village of Buffalo Grove, the Village of Round Lake Beach, and the Village of Barrington Hills. At all times relevant to the events described in this Complaint, the Lake County Major Crimes Task Force investigated certain crimes that occurred in Lake County, Illinois. In this capacity, the Lake County Major Crimes Task Force was and is an extension of defendant offices and municipalities described in this paragraph. Pursuant to the doctrine of *respondeat superior*, Defendant Lake County Major Crimes Task Force is liable, by each of the defendant offices and municipalities described in this paragraph, for all torts committed by the Police Officer Defendants while employed by the Lake County Major Crimes Task Force. The Defendants listed in paragraph 21 through this paragraph are sometimes collectively referred to herein as the "Entity Defendants."

33. All of the Entity Defendants are located and/or incorporated in Illinois.

## ALLEGATIONS OF FACT

### The Murder

34. On the morning of December 9, 1999, a maintenance worker discovered a woman's body in the Greenbelt Forest Preserve in Waukegan. Some six years later, the victim was revealed to be Mary Kate Sunderlin, but her identity would remain unknown throughout the investigation. The victim was found clad in a blue, striped long-sleeved shirt and sweat pants.

35. A week after the discovery of the body, the investigation had made no progress and no potential suspects had been identified.

7

### Defendants Fixate on Jeremy Tweedy and Use Him
### To Invent a False Narrative of the Crime

36.     The investigators assigned to the case had no leads until December 14, 1999, when an undercover officer posing as a prostitute and working at the Motor Inn Motel reported a conversation with a Jeremy Tweedy, a man whom the prosecution itself would later characterize as "truthfully challenged."

37.     After the two began talking, Tweedy claimed to know that the woman whose body was discovered in the Forest Preserve had been picked up by a man in a car near the motel, that five others had joined that man, and that all six had severely beaten the woman. Tweedy claimed to have read about the beating in the newspaper.

38.     With no basis other than his unsubstantiated statements to the undercover officer, Defendants immediately concluded that Tweedy himself had been involved in the crime.  Ultimately, one or more of the Defendant Officers coerced Tweedy to make a series of false statements inculpating himself, Plaintiff, and a man named Jason Johnson.

39.     In reality, Tweedy had no knowledge of the murder and did not even know Plaintiff at the time the victim's body was discovered.

40.     Beginning on December 20, 1999, one or more of the Officer Defendants induced Tweedy to make a series of false statements about the murder. They guided and threatened Tweedy into concocting an elaborate narrative about the murder and Plaintiff's involvement therein by feeding Tweedy fabricated information for him to parrot back. The Officer Defendants did so knowing full well that the information they fed to Tweedy was fabricated and that Tweedy had no knowledge of the murder.

8

41.     In some or all of Tweedy's various accounts, he encountered Plaintiff and Jason Johnson in Plaintiff's motel room on the night of December 8, 1999 and witnessed Plaintiff tie the victim down, whip her with a metal cord, hit her with a bottle, and burn her with hot wax. Tweedy then went to a dog race; upon his return to the motel, he witnessed Plaintiff and Johnson carrying the victim to a van. Tweedy helped them load the victim, who was still alive but severely beaten and deteriorating fast, into the van. The trio drove toward the forest preserve, though Tweedy decided en route to get out of the van.  All of this was false, and the Officer Defendants knew it.

42.     More specifically, the invented narrative included the following fabrications, among many others:

a.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that Plaintiff had burned the victim in his apartment on the night of the murder.

b.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that Plaintiff had whipped the victim with a nylon fishing line in his apartment on the night of the murder, leaving u-shaped marks on her body.

c.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that Plaintiff had hit the victim with a bottle in his apartment on the night of December 8.

d.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that he saw Plaintiff and Johnson carrying the victim out of Plaintiff's apartment on December 8.

e.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that when the victim was being carried into a van by Plaintiff and Johnson, she was wearing a blue, striped long-sleeved shirt that belonged to Plaintiff.

f.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that Plaintiff and Johnson, with Tweedy along for a portion of the ride, took the victim to the forest preserve, where they disposed of the body.

g.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that some days after December 8 he and Plaintiff watched a video about a person being killed by a train, and that Plaintiff made inculpatory statements after the video.

h.      One or more of the Officer Defendants, knowing the information to be untrue, induced Tweedy to state that in the days after December 8 Plaintiff threatened to harm Tweedy and his family if he reported the crime to the authorities.

43.     All of the fabrications in the previous paragraph were introduced at trial, when Tweedy testified as a witness for the prosecution.

44. Because it was their goal to use Tweedy to concoct a false narrative about the murder, the Officer Defendants deliberately brushed aside the following unmistakable indications that Tweedy was simply following their lead and fabricating the story with their guidance:

a. Knowing that Tweedy lacked any independent knowledge of the crime, the Officer Defendants fed him all the details. As Tweedy would later admit, "[t]hey told me everything before I even started talking."

b. Defendants threatened Tweedy into giving statements that contained the information they had fabricated. The Officer Defendants conducted a lengthy interrogation, during which Tweedy was not allowed to eat, drink, or use the bathroom. One or more of the Officer Defendants threatened to throw the book at him, and one or more of the Officer Defendants raised a fist and threatened to punch him.

c. Because Tweedy had no actual knowledge of the murder, he made several statements with glaring inconsistencies regarding, among other topics, who was present during the attack on the victim, who injured the victim and how, whether there was sexual contact between the victim and her attackers, whether liquid wax or burning the victim was involved in the crime, what the men did with the victim after the attack, whether the victim was alive or dead when loaded into the van, who delivered the fatal blow, where the men went in the van and how they got there, whether Tweedy got out of the van half way through the ride, and whether Tweedy was even present during the attack. Defendants deliberately ignored all

of these inconsistencies because they knew the information they had induced Tweedy to provide was false.

d.     Tweedy repeatedly stated to Defendants that the information he had provided was untrue and was repeatedly ignored, with one or more of the Officer Defendants telling him "we were not going to believe his lies."

### Defendants Use Jason Johnson to "Corroborate" the Story They Invented Through Tweedy

45.     The Officer Defendants also interrogated Jason Johnson on December 20, 1999. One or more of the Officers Defendants used Johnson to obtain false "corroboration" of the story they had concocted through Tweedy. In reality, Johnson had no connection to the murder and no knowledge of the facts surrounding the crime. He had never met the victim.

46.     When Johnson told the police he had no knowledge of the murder, one or more of the Defendant Officers physically intimidated him and threatened to "beat the shit" out of him.

47.     One or more of the Defendant Officers also brought Tweedy into the interrogation room with Johnson to demonstrate to Johnson that Tweedy had implicated Johnson in the murder.

48.     One or more of the Officer Defendants told Johnson exactly what to write in his statement, fabricating the information. According to Johnson, "they were just dictating my statement to me."

49.     Johnson reread his statement and told one or more of the Officer Defendants that it was all a lie. At that point, they continued to threaten him.

50.     Johnson also recanted his statement at his first court appearance.  When Johnson again tried to recant after some weeks in jail, one or more of the Officer Defendants told him that they "didn't care what I said." Johnson informed one or more of the Officer Defendants that "they didn't want to hear the truth." Johnson was told that he would spend long time in prison if he did not stick to the fabricated story implicating Plaintiff.

**Defendants Coerce a False Confession from Plaintiff**

51.     One or more of the Officer Defendants and/or other law enforcement personnel burst into Plaintiff's motel room with guns drawn at approximately midnight on December 20, ordered Plaintiff to lie on the bed, and placed him in handcuffs.  Plaintiff was then driven to a law enforcement headquarters and placed in an interrogation room. Plaintiff was 24 years of age at the time of his arrest and had never before been subjected to an interrogation.  At the time of his arrest, Plaintiff was suffering from depression.  He informed one or more of the Officer Defendants of that fact.

52.     Throughout the course of the night, the Officer Defendants subjected Plaintiff to a coercive interrogation, at the conclusion of which Plaintiff made an involuntary, false confession implicating himself in the death of the unidentified woman. The coercive tactics the Officer Defendants employed included but were not limited to the following:

a. The Officer Defendants deprived Plaintiff of sleep. After arresting Plaintiff near midnight, they interrogated him throughout the remainder of the night without giving him any opportunity for sleep or rest. Plaintiff only confessed after an all-night interrogation.

b. The Officer Defendants subjected Plaintiff to a hostile, aggressive and accusatory interrogation. They shouted in Plaintiff's face and intimidated him by standing over him as they questioned him.

c. The Officer Defendants took advantage of Plaintiff's psychological vulnerability and his unfamiliarity with the interrogation process. When Plaintiff was reduced to tears during their angry, hostile questioning, the Officer Defendants ridiculed Plaintiff.

d. The Officer Defendants ignored Plaintiff when he requested an attorney.

e. The Officer Defendants falsely told Plaintiff that they already had conclusive evidence of his guilt.

f. The Officer Defendants refused to accept Plaintiff's protestations of innocence. When Plaintiff cried during the interrogation, the Officer Defendants told him his tears were evidence of his remorse for the murder. When Plaintiff became angry during the interrogation, the Officer Defendants told him his anger was evidence of his violent nature.

g. The Officer Defendants threatened Plaintiff in numerous ways including with threats of lengthy imprisonment if he did not confess and threats that if he did not confess his girlfriend would be arrested and charged with murder.

14

h. The Officer Defendants promised Plaintiff that if he did confess, they would assist him in the criminal process.

53. During the course of the interrogation, the Officer Defendants provided Plaintiff with information concerning how the Officer Defendants believed the unknown woman had been killed. When the Officer Defendants succeeded in overcoming Plaintiff's will, Plaintiff used the information the Officer Defendants had furnished him to create his confession. That confession was wholly false.

**Defendants Use Margaret Hipps to Fabricate More False Information**

54. On December 28, the Officer Defendants interrogated Margaret Hipps, who had been romantically involved with Plaintiff in the past.

55. Knowing the information to be false, the Officer Defendants induced Hipps to claim that the blue, striped sweatshirt found on the victim belonged to Plaintiff. In reality, the sweatshirt had no connection to Plaintiff.

56. Specifically, one or more of the Officer Defendants conveyed to Hipps that they wanted her to say that the sweatshirt belonged to Plaintiff. One or more of the Officer Defendants told Hipps that the sweatshirt had been in Plaintiff's room, knowing this information to be false.

57. Hipps repeatedly denied this falsity only to have her attempts to tell the truth brushed aside. She finally gave in and assented to Defendants' story, writing in a statement, "I Margaret L. Hipps positively identify the blue striped hooded shirt on the

victim in this photo as belonging to Jason Strong. I have worn this shirt on 2-3 occasions in Strong's room."

58.     When Hipps later recanted her false statements, one or more of the Officer Defendants threatened her and accused her of lying. They also said that if she recanted her previous statements and told the truth, they would use Plaintiff's trial to publicize details of Hipps' sex life.

59.     Hipps ultimately testified to the false narrative invented by Defendants at Plaintiff's trial, claiming that the sweatshirt found on the victim belonged to Plaintiff.

**Withholding of Exculpatory Evidence**

60.     The Officer Defendants failed to disclose material, exculpatory evidence to the prosecutors involved in trying Mr. Strong. As a result, this evidence was not disclosed to Plaintiff's defense attorney. Among other evidence known and unknown to Plaintiff, the Officer Defendants withheld from the prosecutors the fact they had used Tweedy, Johnson, and Hipps to create a false narrative in which Plaintiff whipped and beat the victim to death, loaded her into a van while she was clad in his sweatshirt, and buried the body in the forest preserve.

**Plaintiff's Wrongful Conviction**

61.     As a result of the Officer Defendants' misconduct, Plaintiff was wrongfully convicted of first degree murder in the Circuit Court of Lake County, and sentenced to forty-six years' imprisonment. Plaintiff was not eligible for parole and faced spending most of his life behind bars.

62.     Without the Officer Defendants' misconduct, Plaintiff would not have been prosecuted or convicted.

63.     Although hundreds of items were collected and dozens tested, there was no physical evidence linking Plaintiff to the murder in any way. No DNA or other physical evidence from Ms. Sunderlin's body connected to Mr. Strong. No DNA or other physical evidence from the motel room where the State claimed Ms. Sunderlin was sexually assaulted in various ways, tortured, and ultimately murdered with a violent blow to her head linked Ms. Sunderlin to that room. No DNA or other physical evidence from Mr. Strong's van, in which the State claimed Ms. Sunderlin was driven to the Forest Preserve, connected Ms. Sunderlin to the van.

64.     The facts of the crime were wholly inconsistent with Plaintiff's false confession and the fabricated testimony of the other witnesses. The case against Mr. Strong was built around the proposition—asserted in Plaintiff's false confession and in Tweedy's fabricated testimony—that Plaintiff first met Ms. Sunderlin by chance on the evening of December 8, 1999 as she walked along Route 41, that she was lured into Plaintiff's motel room, and that Plaintiff, Tweedy and Johnson sexually assaulted Ms. Sunderlin and killed her over the course of that evening.

65.     During federal *habeas corpus* proceedings following Plaintiff's conviction, three highly qualified pathologists reviewed the autopsy findings with respect to the victim (who, by then, had been identified as Mary Kate Sunderlin), and determined that the false narrative that the Defendant officers concocted for inclusion in the statements of

Tweedy, Johnson and Plaintiff was flatly inconsistent with the physical evidence in numerous respects, including but not limited to the following:

a. Ms. Sunderlin's body was discovered the morning of December 9. Ms. Sunderlin had at that point already been dead for two to four days. Plaintiff could not have encountered her on December 8.

b. Tweedy's testimony described extensive whipping of Ms. Sunderlin in the hours immediately prior to her death with a braided metal cord, leaving u-shaped marks. However, the u-shaped scars on Ms. Sunderlin's body were in various stages of healing, revealing that the whipping occurred over the course of months and weeks and days prior to her death—not in the hours immediately before her demise.

c. The case against Mr. Strong was bottomed on Tweedy's false testimony and an erroneous autopsy finding that Ms. Sunderlin was killed in the early morning hours of December 9 by a blow to the head from a tequila bottle. That could not have happened. Although Ms. Sunderlin did suffer from blunt force trauma to her brain before her death, the trauma occurred no sooner than a day or two before she died — *i.e.*, no later than December 5.

d. At the time of her death, Ms. Sunderlin was suffering from advanced pneumonia. In addition, the blow to Ms. Sunderlin's head would have led to obtundation, a stupor-like state marked by "dulled or reduced level of alertness or consciousness." Ms. Sunderlin's illness and her head injury would have made it impossible for her to walk down a highway on a winter night. Thus,

18

Mr. Strong could not have encountered her walking on Route 41 as the confession asserts and the State theorized at trial.

**Plaintiff's Exoneration**

66.     Plaintiff never gave up on proving his innocence, and was finally exonerated.

67.     On May 28, 2015, the federal District Court granted Plaintiff's petition for a writ of *habeas corpus* and vacated his conviction. The State dropped all charges against him, and he walked out of prison a free man, after spending over 15 years in prison for a crime he did not commit.

68.     On April 15, 2016, the Circuit Court of Lake County granted Plaintiff a Certificate of Innocence, finding that Plaintiff is innocent of the murder of Mary Kate Sunderlin.

**Plaintiff's Damages**

69.     After more than 15 years of unjust imprisonment, Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the years of life experience, which normally equip adults for that task.

70.     Additionally, the emotional pain and suffering caused by losing 15 years in the prime of his life has been substantial. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals and other life events with loved ones, the

opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

71.     Plaintiff's long years of wrongful incarceration forced him into a world of isolation.

72.     As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by the Defendants' misconduct.

### COUNT I – 42 U.S.C. § 1983
### Fifth and Fourteenth Amendments

73.     Each paragraph of this Complaint is incorporated as if restated fully herein.

74.     In the manner described more fully above, the Officer Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

75.     As described more fully above, the Officer Defendants conducted an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the murders of Mary Kate Sunderlin.

76.     The false statements written and coerced by the Officer Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case. These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Mary Kate Sunderlin.

77. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

78. As a result of Officer Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical injury and sickness, loss of liberty, and emotional distress.

## COUNT II – 42 U.S.C. § 1983
### Violation of Due Process

79. Each paragraph of this Complaint is incorporated as if restated fully herein.

80. As described more fully above, all of the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

81. In the manner described more fully above, the Officer Defendants, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence, and/or deliberately withheld exculpatory evidence. In doing so, the Officer Defendants violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

82. Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

83. The Officer Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful

imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

84.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

85.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT III – 42. U.S.C. § 1983
## Federal Malicious Prosecution[1]

86.    Each paragraph of this Complaint is incorporated as if restated fully herein.

87.    In the manner described above, the Officer Defendants individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

---

[1] Plaintiff recognizes that this Circuit currently holds that malicious prosecution is not actionable under 42 U.S.C. § 1983. Other Courts of Appeals have taken the opposite position. Plaintiff pleads the claim here under the Fourth and Fourteenth Amendments to preserve the issue for reconsideration in the U.S. Court of Appeals for the Seventh Circuit or review in the Supreme Court of the United States. The Supreme Court has granted certiorari to resolve this issue in *Manuel v. Joliet, Il.*, No 14-9496.

88.     In so doing, the Officer Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

89.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

90.     As a result of Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene

91.     Each paragraph of this Complaint is incorporated as if restated fully herein.

92.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

93.     As a direct and proximate result of the Officer Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Officer Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

23

94. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT V – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

95. Each paragraph of this Complaint is incorporated as if restated fully herein.

96. After the murder of Mary Kate Sunderlin, the Officer Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

97. Additionally, before and after Plaintiff's conviction, the Officer Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

98. In this manner, the Officer Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

99. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing false confessions – and was otherwise a willful participant in joint activity.

100.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

101.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

## COUNT VI – 42 U.S.C. § 1983
### *Monell* Policy Claims

102.     Each paragraph of this Complaint is incorporated as if restated fully herein.

103.     Plaintiff's injuries, described in detail above, were caused in substantial part by the policies, practices, and customs of the City of Waukegan, whose officers played a central role in the misconduct described herein, and by the Lake County Major Crimes Task Force, which ratified, implemented and pursued the policies and practices of the City of Waukegan in this case.

104.     At all times relevant to the events described in this Complaint, as well as for decades both before and after, there was a widespread practice among City of Waukegan police officers under which officers fabricated evidence, coerced criminal suspects and purported witnesses in the creation of fabricated statements that falsely incriminated themselves or others in crimes, and suppressed and failed to disclose exculpatory evidence and information.  This was accomplished by various means, including:

a. subjecting criminal suspects and purported witnesses to manipulative, suggestive, or coercive interrogations and interviews that directly resulted in false confessions or statements;

b. forcing criminal suspects and purported witnesses to endure unreasonably long and uninterrupted interrogations and interviews, often lasting for many hours and even days;

c. feeding details of crimes to criminal suspects and purported witnesses during interrogations and interviews that were not within their personal knowledge;

d. encouraging criminal suspects and purported witnesses to give knowingly false and fabricated evidence and testimony;

e. promising false incentives during interrogations and interviews in exchange for false testimony;

f. forcing criminal suspects and purported witnesses to sign false statements fabricated by the police or with the help of police;

g. filing false charges against innocent persons and pursing malicious prosecutions despite obvious evidence that the wrong individual had been pursued, arrested, and convicted;

h. covering up, suppressing, and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants;

i. failing to properly train, supervise, discipline, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly

accused of wrongful convictions and of making false reports and statements or of engaging in the conduct described in the preceding sub-paragraphs.

105. The practices described above were and are widespread within the Waukegan police department, and they went on for years both before and after the misconduct directed at Plaintiff. These practices also infected the Lake County Major Crimes Task Force, which was staffed with numerous Waukegan police officers, including some of the Officer Defendants here. These Waukegan police officers played lead roles in building cases brought by the Lake County Major Crimes Task Force. In so doing the Waukegan police officers carried out, implemented, and put into effect the above-described customs, policies, and practices of the Waukegan police department through the Lake County Major Crimes Task Force, importing the customs, policies, and practices of the City of Waukegan to the Lake County Major Crimes Task Force.

106. These policies, practices, and customs have resulted in numerous well-publicized false convictions in cases investigated by the Waukegan police department and the Lake County Major Crimes Task Force, both before and after Plaintiff's wrongful conviction. These include, but are not limited to, the following:

a. Bennie Starks: In 1986 Waukegan police detectives committed numerous wrongful acts, including fabricating false reports and evidence, which resulted in a wrongful conviction and 20 years of wrongful imprisonment. Mr. Starks was freed in 2006 after DNA evidence proved he had not committed the rape.

b. Alejandro Dominguez: In 1990 Mr. Dominguez, then 16, was convicted of a 1989 rape. Waukegan police officers committed numerous wrongful acts in

27

building the case against him, including manipulating witnesses, coercing a fabricated confession, and suppressing exculpatory evidence. Mr. Dominguez's conviction was overturned in 2002, when DNA evidence showed he did not commit the rape.

c. Juan Rivera: In 1992, Waukegan police officers, including Defendants Lucian Tessmann and Donald Meadie, operating through the Lake County Major Crimes Task Force, committed numerous wrongful acts, including coercing confessions, manufacturing evidence, and suppressing exculpatory evidence. This resulted in 20 years imprisonment for a rape and murder that Mr. Rivera did not commit. Mr. Rivera was exonerated when it was shown that his confession was coerced, no physical evidence linked him to the crime, and he was excluded by DNA.

d. Angel Gonzalez: In 1994, Waukegan police officers first had a rape victim "identify" Gonzalez in a highly suggestive manner, and then, after lengthy questioning, forced Gonzalez, who spoke little English, to sign an English-language "confession" that he could not read and that contradicted the Spanish-language account he had given to the police earlier. Gonzalez was cleared 20 years later after DNA proved he had not committed the rape.

e. James Edwards: In 1996 Waukegan police officers committed numerous wrongful acts, including coercing a false confession by feeding false information, which resulted in a wrongful conviction and 15 years of imprisonment for the murder of a local store owner. No physical evidence

28

implicated Mr. Edwards in the crime, and he was eventually cleared after DNA collected at the scene was matched to a man who had been arrested for a series of armed robberies in the area. Prosecutors conceded that his "confession" was both coerced and false.

f.  Colleen Blue: In 2001, after the body of a newborn baby was found in a trash container, Waukegan police officers working through the Lake County Major Crimes Task Force officers, including Defendant Lucian Tessmann, used coercion to obtain a vivid, fabricated confession from Ms. Blue, in which she "confessed" that she delivered the baby while she was alone, had placed it in the container, and could hear the baby crying as she walked away until passing cars drowned out the sound. Charges were dropped after DNA testing determined that the baby was not hers—she had never been pregnant and never had the baby.

g.  Jerry Hobbs: In 2005, Waukegan police officers, including Defendants Valko and Cappelluti, operating through the Lake County Major Crimes Task Force, committed numerous wrongful acts, including an uninterrupted, 20-hour interrogation in which Mr. Hobbs was coerced into confessing to a double rape and murder of his daughter and her friend. After being wrongly imprisoned for 5 years, Mr. Hobbs was exonerated after DNA linked to a convicted rapist proved that Mr. Hobbs was not involved in the crime.

107.    These widespread policies, practices, and customs, and the attendant misconduct leading to the wrongful convictions described above, were adhered to with

the knowledge or the approval of the leaders, supervisors, and policymakers of the City of Waukegan, its police department, and the Lake County Major Crimes Task Force. They were allowed to flourish—and become so well settled as to constitute *de facto* policy of the City of Waukegan and of the Lake County Major Crimes Task Force—because the leaders, supervisors, and policymakers failed to adequately train, supervise, and control their officers, agents, and employees on proper police practices, including interrogation techniques, and because they failed to adequately punish and discipline prior instances of similar misconduct.

108.    Indeed, on information and belief the City of Waukegan never disciplined a single police officer for the misconduct in any of the cases described above. To the contrary, far from disciplining or firing these officers, the City of Waukegan rewarded and promoted them, such that the officers have flourished within the department and within the Lake County Major Crimes Task Force despite their troubled records. For example:

a.  One of the Waukegan police officers who helped build the false case against Mr. Starks was continually promoted through the ranks, and was chief of the Waukegan police department when Starks was exonerated in 2006.

b.  One of the Waukegan police officers involved in fabricating the case against Mr. Dominguez in 1989 had earlier been placed on a watch list by local prosecutors because he had suppressed evidence in another case. The restrictions were lifted, however, at the request of a Waukegan police command official. With the restriction gone, the officer went on to suppress

evidence favorable to Mr. Dominguez. On information and belief the officer was never disciplined for this misconduct, and he retired from the Waukegan police department as a lieutenant.

c. One of the Waukegan police officers who coerced the confession that led to Mr. Gonzalez's false conviction continued to be promoted within the police department, and retired as chief of the Waukegan police department in 2010.

d. Defendant Tessmann, who was involved in coercing false confessions both before and after his misconduct in Plaintiff's case, was continually promoted within the Waukegan police department, became commander of the Lake County Major Crimes Task Force, and retired as deputy chief of the Waukegan police department in 2005.

e. Despite being involved in multiple incidents of witness coercion and evidence fabrication, Defendant Valko was continually promoted after the misconduct outlined above, and on information and belief retired as a commander in the Waukegan police department. He is now a Waukegan alderman.

f. On information and belief, Defendant Cappelluti remains on the Waukegan police force. Even though he has been involved in multiple instances of misconduct leading to wrongful convictions, including coercion and fabrication in the case of Mr. Hobbs and in Plaintiff's case, on information and belief he has never faced discipline and was recently returned to the Waukegan police department's investigative division.

g. On information and belief, Defendant Meadie, who was involved in multiple instances of misconduct leading to wrongful convictions, including coercion and fabrication in the case of Mr. Rivera and in Plaintiff's case, became assistant commander of the Lake County Major Crimes Task Force, and retired as a detective in the Waukegan police department in 2006.

109. The utter lack of consequences suffered (and the rewards enjoyed) by officers who committed multiple acts of serious misconduct directly encouraged abuses such as those affecting Plaintiff, and were the moving force behind the misconduct at issue in this case. These practices became widespread because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. The City of Waukegan and the Lake County Major Crimes Task Force thus caused Plaintiff to be deprived of his rights, as described herein.

## COUNT VII – State Law Claim
## Malicious Prosecution

110. Each paragraph of this Complaint is incorporated as if restated fully herein.

111. The Officer Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

112. The Officer Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

113.    Statements of the Officer Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Officer Defendants also fabricated evidence by creating false inculpatory testimony. The Officer Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Sunderlin murder.

114.    The Officer Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. The Officer Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

115.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

116.    On May 28, 2015, the prosecution terminated in Plaintiff's favor when the federal District Court vacated his conviction.

117.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and emotional distress.

## COUNT VIII – State Law Claim
### Intentional Infliction of Emotional Distress

118.    Each paragraph of this Complaint is incorporated as if restated fully herein.

119.    The acts and conduct of the Officer Defendants as set forth above were extreme and outrageous. The Officer Defendants' actions were rooted in an abuse of

power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

120. As a direct and proximate result of the Officer Defendants' actions, Plaintiff suffered and continues to suffer physical sickness and severe emotional distress.

**COUNT IX – State Law Claim**
**Civil Conspiracy**

121. Each paragraph of this Complaint is incorporated as if restated fully herein.

122. As described more fully in the preceding paragraphs, the Officer Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

123. In furtherance of the conspiracy, the Officer Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

124. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

125. As a direct and proximate result of the Officer Defendants' conspiracy, Plaintiff suffered damages, including physical sickness and severe emotional distress, as is more fully alleged above.

## COUNT X – State Law Claim
## Respondeat Superior

126.     Each paragraph of this Complaint is incorporated as if restated fully herein.

127.     While committing the misconduct alleged in the preceding paragraphs, the Officer Defendants were employees, members, and agents of the Entity Defendants, acting at all relevant times within the scope of their employment.

128.     The Entity Defendants are liable as principal for all torts committed by their agents.

## COUNT XI – State Law Claim
## Indemnification

129.     Each paragraph of this Complaint is incorporated as if restated fully herein.

130.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

131.     The Officer Defendants were employees, members, and agents of the Entity Defendants, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

132.     Lake County is obligated by Illinois statute to pay any judgment entered against the Sheriff of Lake County in his official capacity.

WHEREFORE, Plaintiff JASON Strong respectfully requests that this Court enter a judgment in his favor against Defendants LUCIAN TESSMANN, WILLIAM VALKO, DONALD MEADIE, MICHAEL LUFF, WALTER HOLDERBAUM, DOMENIC CAPPELLUTI, JOHN KREMPOTIC, ED WAGNER, GREG DUFFEY, DON SMITH,

TODD WILLIAMS, ALEXANDER FERNANDEZ, LEONARD BREZINSKI, RICHARD CHIARELLO, CITY OF WAUKEGAN, GARY DEL RE, Former Sheriff of Lake County in his Official Capacity, VILLAGE OF BUFFALO GROVE, VILLAGE OF LINCOLNSHIRE, VILLAGE OF LIBERTYVILLE, VILLAGE OF BARRINGTON HILLS, VILLAGE OF VERNON HILLS, CITY OF NORTH CHICAGO, PARK CITY, VILLAGE OF ROUND LAKE BEACH, COUNTY OF LAKE and LAKE COUNTY MAJOR CRIMES TASK FORCE, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Officer Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JASON STRONG, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**JASON STRONG**

By:       /s/David M. Shapiro
One of his attorneys

Locke E. Bowman
David M. Shapiro
Stephen H. Weil
Vanessa Del Valle
RODERICK AND SOLANGE
  MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
312.503.0844

Maria Hawilo, *admission pending*
J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
312. 503.4808
s-tenenbaum@law.northwestern.edu